Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/23/2018 12:11 AM CST

State of Nebraska, appellee, v.
Avery R. Tyler, appellant.
___ N.W.2d ___

Filed October 19, 2018.    No. S-17-870.

1. **Postconviction: Judgments: Appeal and Error.** Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which is reviewed independently of the lower court's ruling.

2. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

3. **Postconviction: Constitutional Law: Judgments.** Under the Nebraska Postconviction Act, a prisoner in custody may file a petition for relief on the ground that there was a denial or infringement of the prisoner's constitutional rights that would render the judgment void or voidable.

4. **Postconviction.** In the absence of alleged facts that would render the judgment void or voidable, the proper course is to dismiss a motion for postconviction relief for failure to state a claim.

5. **Postconviction: Appeal and Error.** A motion for postconviction relief is not a substitute for an appeal.

6. ____: ____. A motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal; such issues are procedurally barred.

7. **Postconviction: Prosecuting Attorneys: Appeal and Error.** Whether a claim of prosecutorial misconduct could have been litigated on direct appeal and is thus procedurally barred from being litigated on postconviction depends on the nature of the claim.

8. ____: ____: ____. Where the claim of prosecutorial misconduct is such that a determination of the merits is possible based on the record

on direct appeal, it is procedurally barred from being litigated on postconviction.

9. **Trial: Prosecuting Attorneys.** In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial.

10. **Effectiveness of Counsel: Proof.** To show prejudice on a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

Appeal from the District Court for Douglas County: Duane C. Dougherty, Judge. Affirmed.

Michael J. Wilson and Glenn Shapiro, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Funke, J.

Avery R. Tyler appeals from the district court's denial of postconviction relief without an evidentiary hearing. Tyler asserts claims of prosecutorial misconduct and ineffective assistance of trial and appellate counsel. For the reasons set forth herein, we affirm.

## I. BACKGROUND

This appeal follows our decision in *State v. Tyler*,[1] which affirmed Tyler's jury trial convictions and sentences therefrom, including one count of premeditated first degree murder, a Class IA felony for which Tyler received a sentence of life imprisonment, and one count of use of a firearm to commit a

---

[1] *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015).

felony, a Class IC felony for which Tyler received a sentence of 20 to 30 years imprisonment. The trial court ordered the sentences to run consecutively.

## 1. Facts

On September 3, 2012, Delayno Wright was shot and killed outside Halo Ultra Lounge (Halo) in Omaha, Nebraska. Prior to the shooting, Wright, his girlfriend Brittany Ashline, and his cousin LaRoy Rivers were walking through the parking lot toward Wright's vehicle when two men walked past them. One of the men grabbed or brushed against Ashline, which led to Ashline and Wright's confronting the men. Rivers thought he recognized one of the men who was wearing a brown, striped shirt and saw that man break away from the group. Rivers saw a dome light turn on in a vehicle in the parking lot, heard the voice of the man he thought he recognized yelling, "'What's up now?'" and heard gunshots. Rivers could not see the shooter, but Ashline said she saw a man run to a tan or gold sport utility vehicle or Jeep and leave the scene after the shots were fired. Wright indicated he had been shot, was driven to a hospital, and was subsequently pronounced dead due to a gunshot wound to his torso.

When Rivers spoke to investigators, he informed them that he thought he recognized the man wearing the brown, striped shirt as a person he played basketball with in high school. Rivers explained that he thought the man's first name was Avery, but that he was unsure of his last name. While on a detective's computer, Rivers accessed a social media page, viewed Tyler's profile picture, and identified him as the individual in the brown, striped shirt.

During the investigation of the shooting, investigators obtained a photograph of Tyler from a wedding he attended the day before the shooting in which he was wearing a brown, striped shirt. Investigators also obtained security footage showing a sport utility vehicle leaving the scene near the time of the shooting at a high rate of speed. It was subsequently discovered Tyler's girlfriend owned a silver Jeep Commander. At the

scene of the shooting, investigators found eight shell casings. A crime laboratory technician reported that the casings were all fired from the same gun and that there are about 20 guns capable of firing them, including an "FN Five-seveN" pistol. It was discovered Tyler had purchased an FN Five-seveN pistol approximately 2½ months prior to the shooting.

Investigators obtained and executed four search warrants for Tyler's car and for his grandparents', mother's, and girlfriend's residences. During the searches, investigators discovered a cell phone from Tyler's car, a gunlock bearing the "FN" logo from his grandparents' residence, and a letter from his mother's residence. Tyler signed a consent form that allowed investigators to download and search the contents of the cell phone. On the cell phone, investigators discovered another picture of the September 2, 2012, wedding in which Tyler was wearing a brown, striped shirt; a deleted text message from September 2 that read, "What's it like and where is halo?"; and call records and location information.

Based upon this information, Tyler was arrested and charged for the shooting.

## 2. Trial

A jury trial was held in June 2014. At trial, the court heard testimony from 24 witnesses for the State and 5 for the defense. Among the State's witnesses were Ronald King and Jelani Johnson. Tyler's assignments of error in the current appeal concern King's and Johnson's testimony; therefore, a summary of their testimony and the State's arguments concerning their testimony is provided in relevant part below.

### (a) King's Testimony

King testified he met Tyler and Johnson playing basketball for Bellevue University in Nebraska from 2008 to 2010. After those 2 years, King moved back to his hometown in Illinois.

In September 2012, King returned to Nebraska for the wedding of a former teammate and stayed with Johnson who was also attending the wedding. King testified that Tyler attended

the wedding and was wearing a brown, striped shirt. King testified that he left the wedding to go to Halo with Tyler in the vehicle Tyler was driving, a "light-colored Jeep." King explained that once they got to Halo, they parked in the parking lot and were walking on a sidewalk leading into the club when they passed two men and a woman. King testified that he brushed against the woman as she was walking by and that the woman and one of the men confronted them about the contact. King explained that Tyler and the man who confronted them got into a heated exchange and that the other man and King had to separate the two. King testified that Tyler left at some point and that when King walked back toward Tyler's Jeep, he saw Tyler walking from the Jeep toward the location where the confrontation happened with something in his hand. King testified he saw Tyler fire three to five gunshots in the direction where King had last seen the group of three people. After firing the shots, King testified that Tyler returned to the vehicle and Tyler drove them to a second bar. King then texted another friend for a ride and parted ways with Tyler. King testified that he returned to Illinois on his scheduled return flight. Later, King was arrested in Illinois for an unrelated matter and held for a Nebraska warrant. King obtained a lawyer when Omaha Police Department detectives began to question him about the shooting. Eventually, he was given immunity. King explained the terms of the immunity by describing that he gave a formal interview to the police and that if called to testify, he would "have to say the exact same thing."

During cross-examination, King was asked by Tyler's counsel to look at a letter leading to the following exchange:

Q. Do you recognize [the letter]?

A. Yes.

Q. Is it something that you authored, you wrote it?

A. Yes.

Q. When?

A. I don't believe that I wrote it. I probably was speaking and somebody else wrote it.

Q. Okay. What were the circumstances of you making those statements and giving that information?

A. You know, just follow-up on my reactions and how I felt about the situation.

Q. Okay. Was it before you spoke to the cops or after you spoke to the cops?

A. After.

Q. And who — you say you don't think you typed it, someone else did?

A. Yes.

Q. Who?

A. My attorney, possibly.

Q. Well, what do you mean "possibly?"

A. I don't remember who wrote it.

Q. Okay. But it's your words?

A. Yes.

Q. And you say this was done after the police spoke to you in Illinois?

A. Correct.

The letter was not offered into evidence, and King provided no other testimony concerning the letter outside of this exchange. However, Tyler attached a letter to his motion for postconviction relief and alleged the document was the letter his counsel questioned King about at trial. Tyler alleges his trial counsel was informed by the State during an off-the-record recess that the letter discussed was actually written by Johnson. Neither the State nor Tyler's trial counsel disclosed to the jury that Johnson had authored the letter.

(b) Johnson's Testimony

Johnson testified he has known Tyler since childhood. Johnson played basketball at Bellevue University with Tyler and King and asserted that he is friends with both men.

On September 2, 2012, King and Johnson attended a wedding where they saw Tyler. King and Tyler left the wedding reception without Johnson, and Johnson did not see King again until the next day. The next morning, Johnson

had a conversation with King about what had occurred the night before. Tyler showed up uninvited at Johnson's house, where he talked to Johnson and had a private conversation with King.

Johnson testified that days after the wedding, Tyler came to the restaurant where Johnson worked and told Johnson that Tyler's property had been searched by police. Tyler also told him that "his car couldn't be placed at Halo that night," to which Johnson agreed. Johnson further testified that after the meeting at Johnson's workplace, Tyler again came over to Johnson's house and used Johnson's cell phone to call King.

In October 2012, Omaha Police Department detectives initiated an interview with Johnson. Johnson testified that during the interview, detectives questioned him about the night of the wedding and Johnson lied and told them King had driven his car from the wedding and had come back to pick him up later. A couple weeks after this initial interview, detectives again attempted to interview Johnson. Johnson declined to talk with the detectives without an attorney and was charged with accessory to a felony. After Johnson hired an attorney, another interview was set up and Johnson admitted that King did not take his car the night of the wedding and that King did not return later to pick him up.

At trial, Johnson was questioned concerning whether he had a plea agreement. On direct examination, the following exchange occurred:

> Q. Are you testifying here today pursuant to any type of agreement with the Douglas County Attorney's Office?
>
> A. Are you asking if I do have an agreement?
>
> Q. Yes.
>
> A. No.
>
> Q. Okay. Has there been any type of plea agreement entered into between you and the Douglas County Attorney's Office regarding this case?
>
> A. No.

Q. Is there any reason why you haven't already pled to this charge?

A. I mean, I had conversations with my lawyer, and he told me just by coming . . . forth and being truthful that that would be the best route.

On cross-examination, Johnson again testified that he did not have a plea agreement worked out in exchange for his testimony. Johnson explained that after consulting with his attorney, he believed coming forward and being truthful would be the best thing to do. Johnson believed that testifying truthfully would lead to a lesser charge or a dismissal of the accessory charge.

(c) State's Closing Argument

In the State's closing argument, the State addressed both King's and Johnson's testimony and stated, in relevant part:

King and . . . Johnson were put in a bad place. Their teammate and their friend did something very bad. He told them to be quiet about it. He told them to lie about it. When . . . King is approached by the police, sure, he's scared. He's worried he's going to get arrested. He was at a crime scene, a very serious crime scene, one where someone was killed, and he doesn't even bother calling the cops to tell them about it. He leaves the scene, doesn't tell anyone about it. He remains quiet. He was probably scared. He probably didn't want . . . Tyler to get in trouble because it's a friend of his.

So when he's in jail and the police want to talk to him, he wanted a deal. And [defense counsel] criticizes us for giving him that deal. But keep in mind what the police knew versus what . . . King knew. And what I would argue to you is the police and prosecutors don't give deals to liars. We didn't give a deal to . . . Johnson. In fact, the police arrested him and that charge is still pending. But what we knew about . . . King when he said, "Hey, I want immunity," frankly, it's easy to give it to him. Why? Because all the evidence was pointing to

. . . Tyler being the shooter; Jeep Commander leaving the scene that we tied to his girlfriend; FN Herstal gun was the weapon used to kill, we tied that to . . . Tyler; we have a witness, not only identify him at the scene, telling the . . . police, not coincidentally, what he was wearing that night and a picture of him. We have cell phone evidence of him using his phone that night. There was nothing to suggest . . . King was the shooter, and the cops knew that. So to tell . . . King, "We aren't going to arrest you as long as you tell the truth," was simple, which is why it was different with [Johnson]. He didn't tell the truth, so he was arrested.

### 3. Disposition and Direct Appeal

The jury found Tyler guilty of first degree murder and use of a firearm to commit a felony. Utilizing the same counsel he had at trial, Tyler filed a direct appeal with this court claiming errors relating to the district court's denial of various motions to suppress. We concluded the district court did not err by overruling Tyler's motions to suppress and affirmed Tyler's convictions.[2]

### 4. Tyler's Motion for Postconviction Relief

In October 2016, Tyler filed a motion for postconviction relief alleging prosecutorial misconduct and ineffective assistance of trial counsel. As to prosecutorial misconduct, Tyler claimed the State (1) allowed King's known, false testimony concerning the authorship of the letter provided by Tyler's counsel to go uncorrected; (2) introduced new and impermissible evidence during closing arguments in providing the reasoning for King's immunity deal; (3) improperly vouched for and bolstered King's testimony by stating during closing arguments that "'the police and prosecutors don't give deals to liars'"; (4) lied to the jury during closing arguments in

---

[2] See *id.*

representing that Johnson would not receive a deal; and (5) failed to disclose to Tyler's counsel that Johnson's charge would be dropped in exchange for his testimony at trial. As to ineffective assistance, Tyler claimed trial counsel (1) allowed King's false testimony to go uncorrected, (2) failed to object to prosecutorial misconduct in introducing new and impermissible evidence during closing arguments and vouching for and bolstering a State's witness, and (3) failed to appeal the comments made by the county attorney. Tyler additionally argued the cumulative effect of these errors denied him a fair trial.

In an amended order, the district court denied Tyler's motion without an evidentiary hearing. The court found Tyler's claims were procedurally barred, insufficiently pled, and affirmatively refuted by the record. Tyler appeals this order.

## II. ASSIGNMENTS OF ERROR

Tyler assigns, consolidated and restated, that the district court erred in finding an evidentiary hearing was not warranted and (1) dismissing his claims of prosecutorial misconduct regarding King's and Johnson's testimony and the State's closing argument and (2) dismissing his claims of ineffective assistance of counsel for not objecting, correcting, or appealing the alleged prosecutorial misconduct.

## III. STANDARD OF REVIEW

[1] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which is reviewed independently of the lower court's ruling.[3]

[2] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.[4]

---

[3] *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018).

[4] *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018).

## IV. ANALYSIS

[3] Under the Nebraska Postconviction Act, Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 2016), a prisoner in custody may file a petition for relief on the ground that there was a denial or infringement of the prisoner's constitutional rights that would render the judgment void or voidable. This category of relief is "very narrow."[5]

[4] Section 29-3001(2) entitles a prisoner to an evidentiary hearing on a claim for postconviction relief, unless "the motion and the files and records of the case show to the satisfaction of the court that the prisoner is entitled to no relief." In order to be entitled to an evidentiary hearing, a prisoner must allege facts in the motion for postconviction relief that, if proved, would constitute a violation of his or her rights under the U.S. or Nebraska Constitution.[6] A prisoner is not entitled to an evidentiary hearing on the basis of claims that present only conclusory statements of law or fact.[7] In the absence of alleged facts that would render the judgment void or voidable, the proper course is to dismiss the motion for postconviction relief for failure to state a claim.[8]

[5-8] A motion for postconviction relief is not a substitute for an appeal.[9] Therefore, a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal; such issues are procedurally barred.[10] Whether a claim of prosecutorial misconduct could have been litigated on direct appeal and is thus procedurally barred from being litigated on postconviction depends on the nature of the claim.[11] Where

---

[5] *Haynes, supra* note 3, 299 Neb. at 260, 908 N.W.2d at 51.

[6] *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016).

[7] *Id.*

[8] See *State v. Ryan*, 287 Neb. 938, 845 N.W.2d 287 (2014).

[9] *State v. Torres*, 295 Neb. 830, 894 N.W.2d 191 (2017).

[10] *Id.*

[11] *Id.*

the claim of prosecutorial misconduct is such that a determination of the merits is possible based on the record on direct appeal, it is procedurally barred from being litigated on postconviction.[12] But where an evidentiary hearing is necessary to decide the merits of the claim, the failure to raise the issue on direct appeal does not preclude it from being litigated on postconviction.[13]

### 1. Prosecutorial Misconduct

On appeal, Tyler's allegations of prosecutorial misconduct include (1) the prosecutor knowingly misrepresented to the jury that Johnson would not receive a deal before dismissing his felony charge and committed a *Brady v. Maryland*[14] violation by failing to disclose the deal to Tyler, (2) the prosecutor failed to correct King's testimony about authoring the letter, (3) the prosecutor introduced new and impermissible facts during closing arguments, and (4) the prosecutor improperly bolstered a witness during closing arguments.

Prosecutors are charged with the duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.[15] Because prosecutors are held to a high standard for a wide range of duties, the term "prosecutorial misconduct" cannot be neatly defined.[16] Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[17]

### (a) Plea Deal

Tyler claims that the State committed prosecutorial misconduct in failing to disclose to the jury that Johnson had

---

[12] See *id.*

[13] *Id.*

[14] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[15] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[16] *Id.*

[17] *Id.*

received a plea deal. Tyler also claims that the State com-
mitted a violation of *Brady*[18] when it failed to disclose that
Johnson had received a plea deal.

These claims center on Tyler's allegation that the prosecutor
told the jury during his closing argument that Johnson would
not be getting a deal and that after trial, Johnson had his crimi-
nal case dismissed as a result of his testimony. A determination
of these claims on the merits is possible based on the record
without further evidentiary hearing.

[9] In assessing allegations of prosecutorial misconduct in
closing arguments, a court first determines whether the pros-
ecutor's remarks were improper.[19] It is then necessary to deter-
mine the extent to which the improper remarks had a prejudi-
cial effect on the defendant's right to a fair trial.[20]

A prosecutor must base his or her argument on the evidence
introduced at trial rather than on matters not in evidence.[21]
However, a prosecutor is entitled to draw inferences from the
evidence in presenting his or her case, and such inferences
generally do not amount to prosecutorial misconduct.[22] As we
stated in *State v. Dubray*[23]:

> [W]hen a prosecutor's comments rest on reasonably
> drawn inferences from the evidence, he or she is permit-
> ted to present a spirited summation that a defense theory
> is illogical or unsupported by the evidence and to high-
> light the relative believability of witnesses for the State
> and the defense. These types of comments are a major
> purpose of summation, and they are distinguishable from
> attacking a defense counsel's personal character or stating

---

[18] *Brady, supra* note 14.

[19] *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017).

[20] *Id.*; *State v. Nolan*, 292 Neb. 118, 870 N.W.2d 806 (2015).

[21] *Johnson, supra* note 19.

[22] *Id.*

[23] *Dubray, supra* note 15, 289 Neb. at 227, 854 N.W.2d at 604-05.

a personal opinion about the character of a defendant or witness.

During trial, Johnson testified that he did not have a deal with the State but that he hoped his cooperation would lead to a lesser charge or dismissal of his accessory charge. In closing arguments, the State asserted that Johnson had been arrested, had a charge pending, and did not have a deal in place at the time of trial.

Even if Johnson later received a dismissal or reduction of his charge, it would not make Johnson's testimony or the State's assertions during closing arguments untrue. In fact, in review of Johnson's testimony and the State's assertions during closing arguments, the record makes clear that Johnson believed it possible and the State did not dispute that Johnson's charge or sentence might be modified as a result of his testimony. As such, the State's assertions during closing arguments did not mislead or unduly influence the jury. As we have previously stated, a prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.[24] Tyler's claim that the prosecutor misled the jury is without merit.

In regard to an alleged *Brady* violation, the U.S. Supreme Court has held that the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial.[25] Favorable evidence includes both exculpatory and impeachment evidence.[26]

Tyler's motion for postconviction relief alleges that the State committed the *Brady* violation when the State gave Johnson a plea deal after telling the jury that Johnson would not be given a deal. More specifically, Tyler alleges the prosecutor stated

---

[24] See *Johnson, supra* note 19.

[25] *Brady, supra* note 14.

[26] See *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), citing *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

in closing that Johnson would not be getting a deal and that therefore, the State was precluded from giving Johnson a deal after trial.

However, the record does not support this allegation. Instead, the record indicates that the prosecutor stated that "[w]e didn't give a deal to . . . Johnson." The prosecutor's statement was made during rebuttal argument in response to defense counsel's questioning as to why King wanted immunity. The prosecutor's statement was a correct statement of the evidence which indicated that Johnson lied to investigators, that he was charged with accessory to a felony, and that he did not have a deal at the time of trial.

Tyler's motion for postconviction relief did not allege that Johnson's testimony was false or that the State had a plea agreement with Johnson at the time of trial and failed to disclose that fact to Tyler. As a result, Tyler did not present allegations that the prosecution failed to disclose exculpatory or impeachment evidence to support a *Brady* violation. This assignment of error is without merit.

### (b) False Testimony

Tyler alleges that the State committed prosecutorial misconduct in failing to correct King's testimony about authoring the letter provided by Tyler's counsel. In his motion for postconviction relief, Tyler noted that, though King testified he authored the letter, the State informed Tyler's counsel during an off-the-record recess that the letter was written by Johnson. Neither the State nor Tyler's counsel disclosed Johnson's authorship of the letter to the jury. Tyler claims he could not have brought this claim of prosecutorial misconduct on direct appeal, because the State's disclosure that Johnson, not King, authored the letter occurred off the record. However, Tyler acknowledges in his motion for postconviction relief that this issue was known to Tyler's counsel at the time of trial, and there is no evidence that it was raised on direct appeal. It is well settled that a motion for postconviction relief cannot

be used to secure review of issues which were known to the defendant and which were or could have been litigated on direct appeal.[27] Therefore, Tyler's claim of prosecutorial misconduct for failing to correct known, false testimony is procedurally barred.

### (c) Comments During Closing

Tyler alleges that the State committed prosecutorial misconduct in introducing new and impermissible facts during closing arguments. On this claim, Tyler asserts the State committed prosecutorial misconduct in informing the jury that the reason King was offered immunity was because King was at the scene of a crime and failed to report it to the police. Tyler asserts this information was not introduced at trial and, as such, the State should have been precluded from discussing these facts during closing arguments.

A review of the trial record and the State's comments in closing is sufficient to determine whether the State introduced new and impermissible information during closing arguments. Therefore, Tyler could have raised this claim on direct appeal, but failed to do so. As such, this claim is procedurally barred.

### (d) Witness Bolstering

Tyler alleges that the State committed prosecutorial misconduct by improperly bolstering a witness during closing arguments. Tyler argues that the prosecution's statement that "the police and prosecutors don't give deals to liars" bolstered King's credibility.

As with Tyler's previous claim, Tyler's bolstering claim is based on the record of what occurred during closing arguments. The issues of whether the State's comments were improper or materially prejudicial could have been resolved on direct appeal. Because Tyler failed to raise the claim on direct appeal, the claim is procedurally barred.

---

[27] *Torres, supra* note 9.

In consideration of all of the above, we conclude that the district court did not err in dismissing Tyler's claims of prosecutorial misconduct without an evidentiary hearing.

## 2. Ineffective Assistance of Counsel

As to his claims for ineffective assistance, Tyler alleged that his trial counsel allowed King's false testimony to go uncorrected, failed to object to prosecutorial misconduct in introducing new and impermissible evidence during closing arguments and bolstering a State's witness, and failed to appeal the comments made by the county attorney. Tyler additionally argued the cumulative effect of these errors denied him a fair trial. Stated another way, Tyler claims his counsel was ineffective in failing to object, correct, or appeal the alleged instances of prosecutorial misconduct.

[10] Where trial counsel and appellate counsel are the same, a postconviction motion is a defendant's first opportunity to raise a claim of ineffective assistance.[28] A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.[29] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[30] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[31] To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[32] A reasonable probability

---

[28] *State v. Payne*, 289 Neb. 467, 855 N.W.2d 783 (2014).

[29] *State v. Vela*, 297 Neb. 227, 900 N.W.2d 8 (2017).

[30] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[31] *Vela, supra* note 29.

[32] *Id.*

does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.[33] In determining whether counsel was ineffective in failing to object to prosecutorial misconduct, an appellate court must first determine whether the petitioner has alleged any action or remarks that constituted prosecutorial misconduct.[34]

#### (a) King's Testimony

In his motion for postconviction relief, Tyler alleged his counsel was ineffective for failing to correct King's known, false testimony that King authored the letter and, on direct appeal, in failing to allege prosecutorial misconduct that the State allowed known, false testimony to go uncorrected. This claim is without merit, because Tyler has failed to allege sufficient facts to show King's testimony misled or unduly influenced the jury.

Tyler contends that correcting the testimony about the letter would have provided the jury evidence relevant to King's credibility which was at issue as a primary witness for the State. However, Tyler's counsel cross-examined King at trial and questioned King's credibility, including the amount of alcohol he consumed on the day of the shooting, his receiving immunity for his cooperation, and his statements to law enforcement. The jury was able to compare King's testimony with the other witnesses' accounts and consider the terms of King's immunity deal. The authorship of a letter that the jury did not review or have substantive information about had little probative value to King's credibility. Tyler failed to show how evidence that King authored the letter caused any prejudicial effect.

Tyler also claims his counsel should have introduced the letter to impeach King's testimony that he saw Tyler firing

---

[33] *Id.*

[34] *Johnson, supra* note 19.

the gun, because the letter allegedly states that the author did not see the shooting. However, Tyler admits that the letter was actually written by Johnson, so regardless of the alleged content of the letter, any statements about what the author of the letter observed are irrelevant to King's testimony about his own observations.

Therefore, based on all of the above, Tyler has failed to state sufficient allegations under the prejudice prong of *Strickland* to show that, but for counsel's failure to correct King's testimony about the letter and failure to allege on direct appeal that the State committed prosecutorial misconduct in not correcting King's testimony, the result of trial would have been different.

### (b) Closing Arguments

Tyler's remaining claims of ineffective assistance consist of his counsel's failure to object to the State's statements during closing arguments and failure to raise the issue on appeal. Specifically, these claims concern the State's comments about King's immunity deal and Johnson's lack of a plea deal.

### (i) New Evidence

Tyler claims his counsel failed to object to prosecutorial misconduct when the State discussed the reasoning for King's immunity deal. Specifically, Tyler claims prosecutorial misconduct in the State's explaining that the reason King was offered immunity was because King was at the scene of a crime and failed to report it to the police. According to Tyler, this amounts to misconduct, because "information was not introduced into evidence during the trial to show that King had broken the law in any way" for which he would need the immunity deal. He further asserts that "[w]ithout this evidence being introduced improperly, the jury very well could have concluded that King was hiding something or testifying falsely because most witnesses with no involvement in a crime do not need immunity to testify."

Here, the record shows King testified that he was with Tyler on the night of the offense, that King was involved in the altercation which eventually led to the shooting, that King saw Tyler shoot a gun toward the group with whom they had the altercation, that King rode in Tyler's vehicle after witnessing him shoot the gun, that King flew back to Illinois, and that King received an immunity deal before he gave an interview about the shooting. King did not testify to notifying the police of the shooting before the Omaha Police Department detectives initiated contact. In addition, Tyler's counsel argued in closing that if King was not the shooter, then he would not need immunity.

It was a reasonable inference for the State to draw from this testimony that King received his immunity deal to protect him from possible charges connected with his participation in the events surrounding the shooting, and it was appropriate to rebut Tyler's closing argument. As such, the State's assertion that King received his immunity deal in connection with witnessing the shooting and not reporting it does not amount to prosecutorial misconduct.

### (ii) Witness Bolstering

Tyler claims his counsel was ineffective for failing to object to the State's improperly bolstering King's testimony. Specifically, Tyler points to the State's comment that "the police and prosecutors don't give deals to liars" while noting King received an immunity deal as opposed to Johnson, who did not. Such a statement, Tyler argues, implied that King must be honest because he got an immunity deal.

The trial testimony of both King and Johnson support the State's comments in closing. King testified that he was approached by investigators, that he demanded an immunity deal in exchange for an interview, and that he received the deal. Johnson, in turn, testified that he lied to investigators, that he was charged with accessory to a felony, and that he did not have a deal at the time of trial. The inferences made by the State were reasonable given these facts.

In addition, the jury was able to determine on its own the weight and credibility to be given to King's testimony as it heard King testify, heard King being cross-examined as to his credibility, heard testimony from other witnesses concerning King, and heard Tyler's closing argument which addressed concerns about King's truthfulness.

Further, the prosecutor's statement was made in the State's rebuttal argument. In *U.S. v. Delgado*,[35] the court held that the prosecutor did not commit misconduct by arguing during closing arguments that the defendant had lied. The court noted that "context is crucial" and that the prosecutor's statement was made in response to defense counsel's attack of government witnesses and after a detailed summary of the evidence.[36] The statement that the defendant lied, the court explained, was a commentary on what the evidence showed; it was not an assertion of the prosecutor's personal opinion or an attack on the defendant's character.[37]

Here, Tyler's counsel, during closing, raised the issue of King's credibility repeatedly. More specifically, Tyler's counsel questioned why King would need immunity if he had not done anything illegal. To rebut that contention, the prosecutor addressed the reason King was granted immunity and the reason Johnson was not granted immunity. The prosecutor's statement was a commentary on what the evidence showed; it was not an assertion of the prosecutor's personal opinion or a bolstering of King's credibility.

Lastly, the trial judge instructed the jury that the attorneys' statements were not to be taken as evidence. Therefore, absent other evidence, the State's comment that "the police and prosecutors don't give deals to liars" and the State's emphasis on King's having received an immunity deal does not amount to prosecutorial misconduct. Counsel is not ineffective for

---

[35] *U.S. v. Delgado*, 672 F.3d 320 (5th Cir. 2012).

[36] *Id.* at 335.

[37] *Id.*

failing to make an objection that has no merit.[38] As a result, Tyler's trial counsel could not be ineffective for failing to object.

### (iii) Plea Deal

Tyler argues that the State's comment during closing arguments, "what I would argue to you is the police and prosecutors don't give deals to liars[; we] didn't give a deal to . . . Johnson," amounted to prosecutorial misconduct, because Johnson received a deal to drop his pending charge after he provided his testimony. Such a statement, Tyler claims, bolstered Johnson's credibility with the jury, because it appeared as if Johnson were providing testimony against his own best interests even though he had not been given a plea deal.

As discussed in a previous section, however, this ignores Johnson's testimony concerning the status of his then-current charge. Johnson testified that he did not have an agreement with the State in exchange for his testimony and explained that he decided to testify after consulting with his attorney and determining that testifying would be the best decision to lead to his own best outcome. He further explained that the best outcome in his situation would hopefully be that his cooperation would lead to a reduction or dismissal of his accessory charge.

The State's assertion during closing arguments that Johnson had been arrested, had a charge pending, and did not have a deal in place at the time of trial aligns with this testimony. Further, the State's explanation that Johnson did not currently have a deal in place because he lied to police and "the police and prosecutors don't give deals to liars" is a natural inference from the evidence.[39]

Tyler further argues the State's assertion that Johnson lied to the police and "the police and prosecutors don't give deals to

---

[38] See *State v. Stricklin*, 300 Neb. 794, 916 N.W.2d 413 (2018).

[39] See *Johnson, supra* note 19.

liars" implied the State meant Johnson would never be given a deal because of his untruthfulness. However, in review of the record, the State commented only that Johnson had been arrested and charged because he had lied and that Johnson did not have a deal at the time of trial. The State did not say Johnson could not redress his incorrect statements and rehabilitate himself to obtain a deal. Through Johnson's testimony, it is clear that he believed there was a possibility for a future deal if he testified truthfully at trial. Therefore, these claims fail to make sufficient factual allegations to lead to a finding of prosecutorial misconduct.

In consideration of all of the above, Tyler failed to allege sufficient facts that the complained-of remarks in the State's closing argument misled and unduly influenced the jury and constituted prosecutorial misconduct.[40] Therefore, the district court did not err in dismissing, without an evidentiary hearing, the claims of ineffective assistance of counsel for failing to object and appeal the alleged prosecutorial misconduct.

## V. CONCLUSION

For the reasons stated above, we conclude that Tyler was not entitled to an evidentiary hearing on his claims of prosecutorial misconduct and ineffective assistance of counsel. We further conclude that the district court did not err in dismissing Tyler's motion for postconviction relief. Therefore, we affirm the district court's order.

Affirmed.

Freudenberg, J., not participating.

---

[40] See *id.*