Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/17/2020 09:05 AM CST

State of Nebraska, appellee, v.
Raymond Mata, Jr., appellant.
___ N.W.2d ___

Filed October 25, 2019.    No. S-18-740.

1. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

2. **Postconviction: Judgments: Appeal and Error.** Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which is reviewed independently of the lower court's ruling.

3. **Constitutional Law: Trial.** Inherently prejudicial practices, like shackling, are constitutionally forbidden during the guilt phase of a trial unless the use is justified by an essential state interest specific to each trial.

4. **Postconviction: Appeal and Error.** A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal.

5. **Limitations of Actions.** The doctrine of equitable tolling permits a court to excuse a party's failure to comply with the statute of limitations where, because of disability, irremediable lack of information, or other circumstances beyond his or her control, the plaintiff cannot be expected to file suit on time.

6. **Statutes: Initiative and Referendum.** Upon the filing of a referendum petition appearing to have a sufficient number of signatures, operation of the legislative act is suspended so long as the verification and certification process ultimately determines that the petition had the required number of valid signatures.

7. **Postconviction: Proof.** In a postconviction proceeding, an evidentiary hearing is not required when the motion does not contain factual

allegations which, if proved, constitute an infringement of the movant's constitutional rights.

Appeal from the District Court for Scotts Bluff County: Leo P. Dobrovolny, Judge. Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith, Solicitor General, for appellee.

Brian William Stull, of American Civil Liberties Union Foundation, and Amy A. Miller, of American Civil Liberties Union of Nebraska Foundation, for amici curiae American Civil Liberties Union of Nebraska and American Civil Liberties Union Foundation.

Tracy Hightower-Henne, of Hightower Reff Law, G. Michael Fenner, of Creighton University School of Law, and Kevin Barry, of Quinnipiac University School of Law Legal Clinic, for amici curiae Legal Scholars.

Robert F. Bartle, of Bartle & Geier, and Anne C. Reddy, Keith Hammeran, and Tom Lemon, of Greenberg Traurig, L.L.P., for amici curiae former Nebraska Justices and Judges.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Pirtle, Judge.

Funke, J.
Raymond Mata, Jr., appeals the district court's denial of his second amended motion for postconviction relief without an evidentiary hearing. This postconviction action follows our decisions on direct appeal (*Mata I*),[1] after remand (*Mata II*),[2]

---

[1] *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *abrogated on other grounds, State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[2] *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

and after denial of an initial motion for postconviction relief
(*Mata III*).[3] Mata argues the district court erred in denying
his constitutional claims that he was made to wear shackles
in front of the jury during jury selection, overruling and find-
ing untimely his claims that the sentencing scheme requiring
a judge to make factual findings to impose the death pen-
alty was unconstitutional, and overruling and finding untimely
his claims that his constitutional rights were violated by the
Legislature's passing a bill repealing the death penalty but a
public referendum reimposing it. For the reasons stated herein,
we affirm.

BACKGROUND

Mata was found guilty of first degree premeditated murder,
first degree felony murder, and kidnapping in association with
the death of 3-year-old Adam Gomez. In *Mata I*,[4] we explained
the evidence adduced at trial showed Adam was the son of
Patricia Gomez and Robert Billie. Patricia, Billie, and Adam
lived together until September 1998, when Patricia and Billie
ended their relationship and Billie moved out. Shortly thereaf-
ter, Mata and Patricia began dating, and Mata moved in with
Patricia and Adam in October or November. Patricia later told
police that although Mata did not treat Adam badly, Mata con-
sistently expressed resentment of Adam.

Mata moved out on February 10, 1999, and moved in with
his sister. That night, Patricia and Billie had sexual relations.
On February 11, Patricia obtained a restraining order against
Mata. However, Patricia continued to see Mata and they had
sexual relations on February 14.

Later in February 1999, Patricia found out she was pregnant.
Mata became aware of Patricia and Billie's sexual encounter
and heard that the child had been conceived between February

[3] *State v. Mata*, 280 Neb. 849, 790 N.W.2d 716 (2010), *disapproved, State
v. Robertson*, 294 Neb. 29, 881 N.W.2d 864 (2016).

[4] *Mata I, supra* note 1.

7 and 10. Mata had separate confrontations with both Patricia and Billie about their relationship.

On March 11, 1999, Mata discovered that Patricia, Billie, and Adam attended a doctor's appointment for Adam together. That day, Mata unsuccessfully attempted to have Patricia come to his sister's house to visit him. When Patricia would not come to him, Mata went to Patricia. At her residence, Adam was watching television and Mata sent him to bed. Patricia testified she fell asleep while Mata watched television. Patricia said that when she woke up, Mata and Adam were gone, as was the sleeping bag that Adam had been using as a blanket. Mata denied knowing where Adam was when Patricia called at 3:37 a.m. Mata came back to Patricia's house and told Patricia that Adam was likely with her mother or Billie.

In subsequent searches of Mata's sister's residence, police found Adam's sleeping bag and clothing Adam had been wearing in a bag in the dumpster behind the residence. The bag also contained trash identified as being from the residence, including a towel and a boning knife that Mata's sister denied throwing away. In the residence, police found human remains in the basement room occupied by Mata. Hidden in the ceiling was a package wrapped in plastic and duct tape which contained a crushed human skull. The skull was fractured in several places by blunt force trauma that had occurred at or near the time of death. The head had been severed from the body by a sharp object at or near the time of death. In the kitchen refrigerator, police found a foil-wrapped package of human flesh. Mata's fingerprint was found on the foil. Human remains were also found on a toilet plunger and were found to be clogging the sewer line from the residence. Human flesh, both cooked and raw, was found in a bowl of dog food and in a bag of dog food. Human bone fragments were recovered from the digestive tract of Mata's sister's dog. All of the recovered remains were later identified by DNA analysis as those of Adam. Adam's blood was also found on Mata's boots.

After Mata was convicted, he was sentenced to life imprisonment for kidnapping and a three-judge panel sentenced him to death for first degree premeditated murder, finding the existence of an aggravating circumstance under Neb. Rev. Stat. § 29-2523(1)(d) (Cum. Supp. 2002). In *Mata I*, we affirmed these convictions and the life imprisonment sentence for kidnapping. Based upon *Ring v. Arizona*,[5] which was decided after the sentencing, we vacated the death sentence and remanded the cause with directions for a new penalty phase hearing and resentencing on the first degree premeditated murder conviction, requiring the jury to determine the existence of aggravating circumstances.[6]

On remand, the jury unanimously found the existence of the aggravating circumstance of exceptional depravity. A three-judge panel then heard evidence on mitigating circumstances and sentencing disproportionality. The panel found no statutory mitigating circumstances, considered five nonstatutory mitigating circumstances, and concluded the mitigating factors did not approach or exceed the weight of the exceptional depravity finding. The panel determined the penalty was not excessive or disproportionate to the penalty imposed in similar cases and again sentenced Mata to death on the first degree premeditated murder conviction.

In *Mata II*, issued February 8, 2008, we affirmed the imposition of Mata's death sentence. However, we determined that electrocution, as a means of carrying out that sentence, was cruel and unusual punishment in violation of Neb. Const. art. I, § 9, and issued an indefinite stay of Mata's execution.[7] Mata filed a petition for certiorari with the U.S. Supreme Court. On October 6, the Supreme Court denied Mata's petition.

On July 2, 2009, Mata filed a pro se motion for postconviction relief. At a preliminary hearing in October to consider

---

[5] *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

[6] *Mata I, supra* note 1.

[7] *Mata II, supra* note 2.

whether to grant a request of counsel and an evidentiary hearing, Mata argued that he believed an evidentiary hearing would be premature because he was not "'ready'" and wished for the court to first consider the appointment of counsel who he hoped could assist him in evaluating the record and amending the motion before the merits would be determined.[8] Mata explained that he filed the motion for postconviction relief without first fully reviewing the record, because he needed to toll the 1-year statute of limitations for filing an application for a writ of habeas corpus in federal court. He claimed that our indefinite stay of his execution had placed him in a legal "'limbo'" which prevented him from filing a habeas action within a year from the final judgment.[9] Mata stated he would like an opportunity to amend his motion, with or without counsel.

In a single final order, the district court denied both an evidentiary hearing and Mata's request for appointment of counsel. The court did not specifically determine whether the motion for postconviction relief presented any justiciable issue which would entitle Mata to appointment of counsel. Instead, the court found that the files and records affirmatively showed that Mata was entitled to no relief based on the allegations in his motion.

In *Mata III*, we found it was an abuse of the district court's discretion to deny Mata leave to amend his motion for postconviction relief, reversed the district court's judgment, and remanded the cause with directions to appoint Mata counsel and grant him leave to amend his motion. The mandate in *Mata III* was issued on March 8, 2011, and Mata was appointed postconviction counsel on March 15.

In May 2015, the Nebraska Legislature passed 2015 Neb. Laws, L.B. 268, which abolished the death penalty in Nebraska, and then overrode the Governor's veto of the bill. Within L.B.

---

[8] *Mata III, supra* note 3, 280 Neb. at 851, 790 N.W.2d at 717.

[9] *Id.* at 851, 790 N.W.2d at 718.

268, the Legislature provided that "in any criminal proceeding in which the death penalty has been imposed but not carried out prior to the effective date of this act, such penalty shall be changed to life imprisonment." The Legislature adjourned sine die on May 29. Because L.B. 268 did not contain an emergency clause, it was to take effect on August 30.[10]

Following the passage of L.B. 268, opponents of the bill sponsored a referendum petition to repeal it. On August 26, 2015, the opponents filed with the Nebraska Secretary of State signatures of approximately 166,000 Nebraskans in support of the referendum. On October 16, the Secretary of State certified the validity of sufficient signatures. Enough signatures were verified to suspend the operation of L.B. 268 until the referendum was approved or rejected by the electors at the upcoming election. During the November 2016 election, the referendum passed and L.B. 268 was repealed, that is, in the language of the Constitution, the act of the Legislature was "'reject[ed].'"[11]

On December 4, 2017, Mata filed his first amended motion for postconviction relief, and on March 16, 2018, he filed a second amended motion. The district court denied Mata's second amended motion for postconviction relief without an evidentiary hearing. Mata timely appealed.

## ASSIGNMENTS OF ERROR

On appeal, Mata assigns, consolidated and restated, that the district court erred in (1) denying the claim that his constitutional rights were violated by being shackled during jury selection, because it could have been, and was, brought and decided on direct appeal; (2) denying and finding untimely Mata's claims that his Sixth Amendment rights were violated by having a panel of judges find mitigating circumstances and weigh those circumstances against the jury's finding of aggravating

---

[10] See *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

[11] See *id.* at 706, 931 N.W.2d at 877. See, also, Neb. Const. art. III, § 3.

circumstances; (3) denying and finding untimely Mata's claims that the referendum process and result amounted to an impermissible bill of attainder, cruel and unusual punishment, and violations of his due process rights by imposing a death sentence on Mata after it was changed to life imprisonment by L.B. 268; and (4) denying and finding untimely Mata's claims that the process of the referendum and its supporting campaign were an improper exercise violating constitutionally recognized separation of powers.

## STANDARD OF REVIEW

[1] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.[12]

[2] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which is reviewed independently of the lower court's ruling.[13]

## ANALYSIS

### Use of Shackles During Jury Selection

Mata first assigns that the district court erred in denying the claim that his constitutional rights were violated by being shackled during jury selection. On this assignment, Mata alleges he was required to walk with shackles into the courtroom, in front of the jury to be selected, before being seated. Mata argues the district court incorrectly determined this issue could have been, and was, brought and decided on direct appeal, because *Deck v. Missouri*[14] was not decided until after Mata's first appeal.

---

[12] *State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018).

[13] *State v. Tyler*, 301 Neb. 365, 918 N.W.2d 306 (2018).

[14] *Deck v. Missouri*, 544 U.S. 622, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005).

[3] This argument is without merit. *Deck* did not establish a new rule for the use of shackles throughout a trial. *Deck* extended the existing holding detailed in *Holbrook v. Flynn*[15] that inherently prejudicial practices, like shackling, are constitutionally forbidden during the guilt phase of a trial unless the use is "justified by an essential state interest specific to each trial." *Deck* clarified that this requirement also applies to the penalty phase.[16]

[4] In *Mata I*, we addressed Mata's claim of a constitutional violation of his rights due to his being shackled during jury selection and specifically analyzed it under the requirement detailed in *Holbrook*.[17] In his current appeal, Mata makes no new arguments based upon *Deck*'s extension of that requirement. Instead, Mata seeks to relitigate his claims which were rejected on direct appeal, because *Deck* was decided after *Mata I* and restated *Holbrook*'s holding. A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal.[18] Accordingly, this assignment is procedurally barred.

Use of Panel of Judges in
Mata's Sentencing

Mata next assigns the district court erred in denying and finding untimely his claims challenging the use of the panel of judges to consider mitigating circumstances and weigh those circumstances against the jury's finding of aggravating circumstances. In considering this constitutional challenge to Nebraska's capital sentencing scheme, we must first determine whether these claims are time barred under Neb. Rev. Stat. § 29-3001(4) (Reissue 2016).

---

[15] *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

[16] *Deck, supra* note 14.

[17] *Mata I, supra* note 1.

[18] *Allen, supra* note 12.

The Nebraska Postconviction Act contains a 1-year time limit for filing a verified motion for postconviction relief, which runs from one of four triggering events or August 27, 2011, whichever is later.[19] The triggering events are:

(a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;

(b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

(c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review[.][20]

Mata first made his postconviction claims challenging the use of a panel of judges to find and consider mitigating circumstances in his initial amended postconviction motion filed December 2017. Mata argues his claims are not time barred, because the U.S. Supreme Court in *Hurst v. Florida*[21] provided newly recognized constitutional requirements for capital sentencing schemes. Although *Hurst* was decided in January 2016,[22] Mata and amici curiae argue that equitable tolling should apply because the passage of L.B. 268 and its repeal through public referendum created uncertainty as to Mata's sentence.

---

[19] *State v. Harrison*, 293 Neb. 1000, 881 N.W.2d 860 (2016).

[20] § 29-3001(4).

[21] *Hurst v. Florida*, ___ U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016).

[22] *Id.*

[5] The doctrine of equitable tolling permits a court to excuse a party's failure to comply with the statute of limitations where, because of disability, irremediable lack of information, or other circumstances beyond his or her control, the plaintiff cannot be expected to file suit on time.[23] However, to date, we have not determined whether the doctrine of equitable tolling applies to postconviction actions brought under § 29-3001.[24] In this matter, we again need not make the determination as to whether equitable tolling applies to postconviction actions. In order for *Hurst* to be pertinent, the holding must have recognized a constitutional claim and that the newly recognized right is applicable retroactively to cases on postconviction collateral review.

In *State v. Lotter*,[25] we considered the question of whether *Hurst* was a triggering event under § 29-3001(4) to challenges to Nebraska's capital sentencing scheme. In *Lotter*, the defendant filed a motion for postconviction relief alleging Nebraska's capital sentencing scheme was unconstitutional in light of *Hurst* and within a year of the *Hurst* decision. In finding this claim time barred, we determined that the *Hurst* decision did not initially recognize a constitutional claim and set forth a new rule of law for sentencing. We explained *Hurst* merely applied the constitutional requirement recognized in *Ring*[26] that "capital defendants are entitled to a jury determination of any fact that would increase the possible maximum punishment," which was a holding that utilized a rule from *Apprendi v. New Jersey*[27] that "'"[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that

---

[23] *State v. Conn*, 300 Neb. 391, 914 N.W.2d 440 (2018).

[24] See, *id.*; *State v. Huggins*, 291 Neb. 443, 866 N.W.2d 80 (2015).

[25] *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018), *cert. denied* ___ U.S. ___, 139 S. Ct. 2716, ___ L. Ed. 2d ___ (2019).

[26] *Ring, supra* note 5.

[27] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

increase the prescribed range of penalties to which a criminal defendant is exposed."'"[28]

In *Lotter*, we specifically addressed the argument Mata now raises that *Hurst* expanded on *Ring* and *Apprendi* and announced a new requirement that a jury must find and consider mitigating circumstances instead of a panel of judges. We stated:

> Most federal and state courts agree that *Hurst* did not hold a jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances. The 10th Circuit aptly observed: "[T]he Supreme Court's holding in *Hurst* only referenced the [finding of aggravating circumstances] . . . . The Court thus did not address whether the second of the required findings—that mitigating circumstances do not outweigh the aggravating circumstances—is also subject to *Apprendi*'s rule." . . . The plain language of *Hurst* reveals no holding that a jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances. And this court has previously concluded that neither *Apprendi* nor *Ring* require[s] that the determination of mitigating circumstances, the balancing function, or the proportionality review be undertaken by a jury.[29]

We find no reason to depart from our determination in *Lotter* that the *Hurst* opinion merely applied previously recognized constitutional requirements to Florida's sentencing statute and that it did not extend the holding in *Ring* and *Apprendi* to finding and considering mitigating circumstances in capital sentencing schemes. As such, *Hurst* did not create a triggering event under § 29-3001(4) and Mata's claims concerning Nebraska's sentencing scheme are untimely and procedurally barred.

---

[28] *Lotter, supra* note 25, 301 Neb. at 129, 917 N.W.2d at 855.

[29] *Id*. at 144-45, 917 N.W.2d at 863-64.

## L.B. 268 and Public Referendum

Mata assigns that his constitutional rights against cruel and unusual punishment were violated and that he was deprived due process of law by L.B. 268 and its repeal by public referendum, which constituted an impermissible bill of attainder. Central to all three constitutional claims is the proposition that L.B. 268 changed his sentence to life imprisonment and the public referendum changed it back to death.

Contrary to this proposition, however, L.B. 268 never went into effect. L.B. 268 was passed in May 2015 and was set to take effect on August 30.[30] On August 26, opponents filed with the Nebraska Secretary of State approximately 166,000 signatures in support of a referendum.[31] Under the Nebraska Constitution, when a referendum is invoked as to any act "by petition signed by not less than ten percent of the registered voters . . . , it shall suspend the taking effect of such act" until a vote on the referendum.[32] Therefore, L.B. 268 was suspended 4 days before the effective date.

Mata and amici curiae argue a suspension under article III, § 3, of the Nebraska Constitution applies only once the Secretary of State determines the validity, sufficiency, and count of the petition's signatures and determines whether constitutional and statutory requirements have been met. In the instant case, the Secretary of State did not certify the validity of sufficient signatures until October 16, 2015. Under Mata and amici curiae's view, L.B. 268 was not suspended until the October 16 certification and was in effect from its August 30 effective date until this certification.

We addressed this argument in *State v. Jenkins*.[33] In that case, Nikko Jenkins, who was convicted but not sentenced to death prior to the passage of L.B. 268, argued L.B. 268 and its

---

[30] See *Jenkins, supra* note 10.

[31] See *id*.

[32] Neb. Const. art. III, § 3.

[33] *Jenkins, supra* note 10.

subsequent repeal amounted to a violation of the Ex Post Facto Clauses of the U.S. and Nebraska Constitutions. In denying this claim, we rejected the notion that signatures must be verified and certified before an act's operation will be suspended. We reasoned:

Jenkins' notion conflicts with several fundamental principles. The power of referendum must be liberally construed to promote the democratic process. The power is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter. The constitutional provisions with respect to the right of referendum reserved to the people should be construed to make effective the powers reserved. Stated another way, the provisions authorizing the referendum should be construed in such a manner that the legislative power reserved in the people is effectual. The right of referendum should not be circumscribed by narrow and strict interpretation of the statutes pertaining to its exercise.

Jenkins' contention—that suspension cannot occur until a sufficient number of signatures are certified— would make ineffectual the people's power to suspend an act's operation. Whether an act went into effect, and for how long, would depend upon how quickly the Secretary of State and election officials counted and verified signatures. Jenkins' argument demonstrates the absurdity of such a view. Because the Secretary of State was unable to confirm that a sufficient number of voters signed the petitions until October 16, 2015, Jenkins contends that L.B. 268 went into effect on August 30, thereby changing all death sentences to life imprisonment and changing the status of any defendant facing a potential death sentence to a defendant facing a maximum sentence of life imprisonment. Such an interpretation would defeat the purpose of this referendum—to preserve the death penalty. Our constitution demands that the power of referendum not be impaired by ministerial tasks appurtenant to the process.

Having produced the signatures necessary to suspend the act's operation, the people were entitled to implementation of their will.[34]

[6] As in *Jenkins*, we conclude that upon the filing of a referendum petition appearing to have a sufficient number of signatures, operation of the legislative act is suspended so long as the verification and certification process ultimately determines that the petition had the required number of valid signatures.[35] Accordingly, L.B. 268 was suspended on August 26, 2015, 4 days prior to the effective date by the filing of the referendum petition and necessary signatures. Mata's cruel and unusual punishment, due process, and bill of attainder claims which assert that L.B. 268 changed his sentence to life imprisonment and that the repeal of L.B. 268 resentenced him to death fail, because L.B. 268 was suspended and no such changes in his sentence occurred.

It appears Mata may also be claiming he was subjected to cruel and unusual punishment by the political debate on the death penalty, the possibility that his sentence would be changed by L.B. 268 regardless of whether it went into effect, and the threat of his sentence of death remaining through the repeal of L.B. 268. However, the entirety of Mata's analysis and supporting authority presumes his sentence was changed by L.B. 268, which, as determined above, did not occur, because it was suspended prior to its effective date. Mata provides no argument or authority for the proposition that a cruel and unusual punishment violation could occur from a stated possibility of a change in a defendant's sentence and the public debate on that issue, and we find none.

Additionally, Mata's assertion that public debate and the potential effect of a suspended bill is enough to warrant a cruel and unusual punishment finding is flawed. Assuming without deciding that emotional or psychological harm alone

---

[34] *Id.* at 709-10, 931 N.W.2d at 878-79.

[35] *Jenkins, supra* note 10.

is to be considered pain in an Eighth Amendment analysis, the U.S. Supreme Court has repeatedly held that because some risk of pain is inherent in any method of execution, the Constitution does not require the avoidance of all risk of pain.[36] "'The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'"[37]

If the potential for a modification in a defendant's conviction or sentence were sufficient, any defendant convicted and sentenced for violating a law would be eligible for relief every time a change in that law were contemplated by the Legislature, contemplated by a public referendum, vetoed by the Governor, or subjected to public debate. Moreover, it would open the door to a cruel and unusual challenge following every case where an appeal of a conviction or sentence is granted, whether successful or unsuccessful, in that the appeal process would also provide a possibility for a change in the party's conviction or sentence. While we acknowledge the potential for modification of a defendant's conviction or sentence is likely to affect that defendant, this potential does not rise to the level of unnecessary and wanton infliction of pain necessary for a determination of cruel and unusual punishment.[38] Instead, they are necessary aspects of our democratic system which demands the examination and reexamination of its laws and participation of the electorate through political

---

[36] *Bucklew v. Precythe*, ___ U.S. ___, 139 S. Ct. 1112, 203 L. Ed. 2d 521 (2019); *Glossip v. Gross*, ___ U.S. ___, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015); *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008).

[37] *Wilkins v. Gaddy*, 559 U.S. 34, 37-38, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010), quoting *Hudson v. McMillian*, 503 U.S. 1, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

[38] See, U.S. Const. amend. VIII; Neb. Const. art. I, § 9. See, also, *Mata II, supra* note 2.

debate. Accordingly, Mata was not subjected to cruel and unusual punishment by the political debate on the death penalty, the possibility that his sentence would be changed by L.B. 268, and the threat of his sentence of death remaining through the repeal of L.B. 268.

## SEPARATION OF POWERS

Mata next challenges the process involved in the repeal of L.B. 268 through the public referendum. To the extent Mata's claims under this assignment require that L.B. 268 went into effect prior to being suspended by the referendum process, those claims are without merit as described in the previous section.[39]

On Mata's remaining claims under this assignment, Mata asserts the Governor and State Treasurer impermissibly organized and contributed to a group which opposed L.B. 268 and worked toward its repeal through the public referendum, solicited money for the opposition group, and took on leadership within the opposition group. Mata seems to make claims of due process and cruel and unusual punishment violations derived from separation of powers requirements under the Nebraska Constitution. However, while Mata states that the participation of the Governor and State Treasurer in the process of the referendum violated his due process rights and rights against cruel and unusual punishment, it is unclear on what basis Mata is alleging such violations occurred. Instead, Mata's argument exclusively centers on how the Governor's and State Treasurer's actions supporting and participating in the referendum violated the constitutional separation of powers requirements and that such violations invalidated the referendum.

Mata relies on two provisions under the Nebraska Constitution: Neb. Const. art. III, § 1, and Neb. Const. art. II, § 1. Article III, § 1, provides:

---

[39] See *Jenkins, supra* note 10.

The legislative authority of the state shall be vested in a Legislature consisting of one chamber. The people reserve for themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the Legislature, which power shall be called the power of initiative. The people also reserve power at their own option to approve or reject at the polls any act, item, section, or part of any act passed by the Legislature, which power shall be called the power of referendum.

Article II, § 1, provides:

The powers of the government of this state are divided into three distinct departments, the legislative, executive, and judicial, and no person or collection of persons being one of these departments shall exercise any power properly belonging to either of the others except as expressly directed or permitted in this Constitution.

Mata contends these provisions establish that legislative authority is vested solely within the Legislature and the people through the referendum process unless expressly directed or permitted under the Constitution. Mata argues that this means members of the executive branch, such as the Governor and State Treasurer, are prohibited from initiating, participating, instructing, and actively supporting legislative initiatives through a referendum or organizing, participating, instructing, and actively supporting groups to do the same.

Without determining the constitutional appropriateness of the Governor's and State Treasurer's participation in the referendum process, Mata's separation of powers claims fail because the result of the referendum is not invalidated even if such actions were constitutionally improper as alleged. Such a determination is in line with cases where we have previously found dual-service violations.[40] In those cases, the remedy

---

[40] See, *State ex rel. Stenberg v. Murphy*, 247 Neb. 358, 527 N.W.2d 185 (1995); *State ex rel. Spire v. Conway*, 238 Neb. 766, 472 N.W.2d 403 (1991).

was not abandonment of any action in which the violating party participated but was to remove the party from the violating position.[41]

In addition, Mata asserts the Governor and State Treasurer acted improperly but does not allege that the Governor's and State Treasurer's participation influenced the referendum, that the referendum would have been frustrated if they had not participated, that votes were changed due to their participation, or how the referendum and its results are impossibly linked to the alleged inappropriate participation. At oral argument, Mata's counsel admitted that he was unsure what impact the Governor or the State Treasurer had on the referendum process.

In contrast, the facts which Mata did allege demonstrate the repeal of L.B. 268 did not occur solely at the Governor's and State Treasurer's direction. The referendum process was a public process which required a petition with the signatures of more than 10 percent of the registered voters for its initiation, it required public debate and deliberation, and it required a public vote.

[7] In a postconviction proceeding, an evidentiary hearing is not required when the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights.[42]

Mata did not allege facts sufficient to invalidate the repeal of L.B. 268 due to separation of powers violations, and therefore, Mata's claims under this assignment fail to establish a denial or infringement on his rights so as to render his sentence void or voidable. Accordingly, Mata's separation of powers claims fail.

## CONCLUSION

For the reasons stated above, Mata is not entitled to postconviction relief for his constitutional claims involving being

---

[41] See *id.*

[42] *Allen, supra* note 12.

shackled during jury selection, his having a panel of judges find and weigh mitigating circumstances, the effect of L.B. 268 and the referendum rejecting it, and the Governor's and State Treasurer's participation in the referendum process. Accordingly, the district court did not err in denying Mata's motion for postconviction relief without an evidentiary hearing.

Affirmed.

Freudenberg, J., not participating.