IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. QASIM

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DARWEESH S. QASIM, APPELLANT.

Filed May 14, 2024.    No. A-23-255.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Darweesh S. Qasim appeals his conviction in the district court for Lancaster County for negligent child abuse. He alleges a multitude of errors related to discovery, trial, and sentencing. Based on the reasons that follow, we affirm.

## II. BACKGROUND

In August 2021, Qasim was charged with child abuse, a Class IIIA felony. The victim was his 15-year-old daughter, D.D.

In July 2022, Qasim filed a motion to dismiss the charge and a motion to exclude the testimony of D.D., both alleging that the State failed to timely disclose exculpatory and impeachment evidence in the form of statements made by D.D. to a third party. A hearing was held on the motions and the court denied the motions. A jury trial followed.

- 1 -

D.D. testified that on April 14, 2021, she was in her bedroom when her younger sister, Duna, came in and said that Qasim wanted D.D. to come downstairs. She told Duna to ask Qasim if it was important. After Duna left, Qasim came upstairs to her bedroom and confronted her about not listening to him. D.D. testified that Qasim was mad and was yelling at her. He asked for her phone, and she did not want to give it to him because she was worried he would break it as he had done once before. D.D. testified that her refusal to give him the phone made him angry. He then picked up a computer charging cord from the floor and started hitting her with it on her back, legs, and face. He also grabbed her by the hair, slapped her face, and punched her in the head. She got away from him by throwing a blanket from her bed on him and then ran downstairs.

D.D. testified that she tried to run outside but her older brother, Azad Seydou, was downstairs and he grabbed her by the shoulder and her hair and threw her in the living room. She testified that her siblings, as well as her mother, were in the living room at the time. D.D. stated that she threw her phone under the couch and then hid behind her mother for protection. When Qasim came downstairs, he grabbed D.D. from behind her mother and hit her a couple times with his fists on her face. D.D.'s mother pushed Qasim away from D.D. and told Qasim to stop because the neighbor was going to hear them. At that point, Qasim stopped hitting D.D. and she ran into the bathroom.

D.D. testified that when she was in the bathroom she was scared. She also testified that her head hurt, her back was bleeding, and some of her hair was falling out. When she came out of the bathroom, she went to her mother and showed her the injuries on her back. D.D. subsequently showed Qasim her back and he showed no remorse. He told her that it would not have happened if she had not misbehaved.

D.D. testified that at some point later, Qasim apologized to her and gave her phone back to her. She stated that during this encounter Qasim kissed her neck and tried to touch her chest, but she pushed him away. After D.D. had her phone back, she went into the bathroom and took pictures of her back. She sent the pictures to a friend and told the friend that Qasim had caused the injuries. The friend told D.D. to call the police, but D.D. did not want to because she was scared as to what would happen to her family.

Later that evening, the police arrived at the family's home. D.D. testified that her parents and siblings were mad at her because they thought she called the police, but she did not. D.D. spoke to the police officers and told them what happened between her and Qasim. The officers also took pictures of her injuries, including her back, face, and leg.

The day following the incident, D.D. went to school and was called into the office of the school counselor. D.D. told the counselor what her father had done the day before and showed her the injuries. Alex Rindone from the Department of Health and Human Services (DHHS) came to the school later in the day and interviewed D.D.

D.D. testified that every time someone came to talk to her about the incident, Qasim told her to say that she caused the injuries herself and that she wanted to stay with her family. She testified that her older sister, S.S., also told her to tell a different story than what happened.

D.D. admitted that she had harmed herself in the past. She had a scar on her arm where she had used a pen to carve the letter "A." She had retraced it on two other occasions. D.D. stated that she carved on her arm because she was sad and wanted to hurt herself. D.D. denied causing the injuries to her back herself and denied ever telling anyone that she caused the injuries to herself.

Rebecca Henning, the school counselor, testified that she had experience with students who harmed themselves. She explained that typically when a student self-harms, there are marks or injuries on his or her wrist or forearm, and the marks are straight or parallel to each other. She further stated that the self-harm marks are in a location the individual could reach to do it to himself or herself. Henning testified that the marks on D.D.'s back had no pattern, and she did not think D.D. could have physically reached around to where the marks were located on her back. Henning also indicated that the more than 50 students she has talked to about self-harm have admitted to causing the harm themselves and none have ever told her that someone else caused the harm.

Lincoln Police Officer Benjamin Jennings testified that he was dispatched to D.D.'s home on the evening of April 14, 2021. He spoke with Qasim, who speaks little English, and D.D.'s brother, Azad, was present and translated the communication between Jennings and Qasim. Jennings later spoke with Qasim without Azad present by using an interpreter over the phone through a telecommunication service called LanguageLinc. His conversations with Qasim were recorded on his body-worn camera and the State offered the video of the recording into evidence. Qasim objected but ultimately portions of the video from the body camera were received as evidence and played for the jury. The court's interpreter translated what was said by Qasim during his conversation with Jennings, rather than relying on the translation by LanguageLinc. Qasim objected to the use of the court interpreter, which the court overruled.

During the conversation between Jennings and Qasim, Qasim indicated that he thought D.D.'s injuries were from playing soccer. He also stated that if D.D. keeps causing him and her mother stress, "then she should go anywhere she wants." Qasim also indicated that if D.D. stayed somewhere else that night, he was not going to allow her to come back home. Jennings testified that it appeared to him that Qasim did not want D.D. to live in the household or to care for her anymore. On the recording, Qasim also stated his belief that D.D. caused the injuries herself.

Jennings also spoke with D.D. and the conversation was recorded on his body-worn camera. The video of his contact with D.D. from his body-worn camera was entered into evidence and played for the jury. Jennings testified that D.D. told him her father had been upset about her having her phone and "at some point he began to hit and kick her, chased her downstairs, and . . . she was whipped with a – a power cord." He observed she had a swollen lip and contusions on her back. A female officer assisted in getting photos of D.D.'s injuries. Jennings was asked about D.D.'s demeanor as she explained what happened, and he stated she was anxious, tearful, and upset.

After the State rested Qasim moved for a directed verdict, which the court overruled. Qasim then presented his defense.

Dawn Schroder, an intensive family preservation specialist who worked with D.D., testified that D.D. told her Qasim had not hit her with the charging cord but rather, she had caused the injuries herself because she was angry at her father. D.D. did not want to be part of her family and wanted to live with her soccer coach and his family. D.D. refused to meet with Schroder after she told her she caused her own injuries.

Schroder testified that she also worked with D.D.'s family and they were upset about D.D.'s allegations and D.D. knew they were upset. Schroder testified that D.D. did not seem to have any emotion and was "unresponsive" when talking about her family being upset with her.

She testified that it was not uncommon for victims of violence in the home to be unresponsive, nor was it uncommon for victims to say the violence did not happen.

Azad, who was 20 years old at the time of trial, was not living at the family home at the time of the incident but visited frequently. He testified that on April 14, 2021, he picked up one of his sisters from school and took her home. He stayed at the house for about 30 minutes and did not return to the house until later that evening when the police officers arrived. Azad testified that he did not see D.D. when he was at the house after dropping his sister off after school. He denied grabbing D.D.'s hair and throwing her on the floor in the living room. He also testified that he did not see Qasim harm or injure D.D. on April 14, 2021. Azad was asked for his opinion as to D.D.'s truthfulness and he testified that she had a habit of lying.

On cross-examination, Azad testified that he was not at the family home when D.D. was harmed so he did not know what happened to her or how it happened. He also testified that Qasim was upset when the police were at the house, and he said that if D.D. was going to cause problems and not follow the rules of the house she could leave the family.

S.S. is one of D.D.'s sisters. She was 17 years old at the time of the trial. She testified that on April 14, 2021, Azad brought her home from school. At some point Qasim asked her to go get D.D. from the bedroom she and D.D. shared. When S.S. got to the bedroom door, the door was locked and D.D. was screaming. She then told S.S. to leave her alone. S.S. testified she did not see D.D. and Qasim argue that day and she did not see Qasim hurt D.D. in any way. She testified that she believed her father is a peaceful person. S.S. also testified that D.D. would sometimes tell lies.

On cross-examination S.S. indicated that no one told her to say something about the incident at issue that she knew did not happen, and no one asked her to lie about what happened. She further stated she had not felt any pressure to lie or misrepresent anything that happened. S.S. indicated she felt safe in her home and was not concerned about any repercussions from her testimony.

Kori Omar, Qasim's wife and D.D.'s mother, testified that prior to the incident on April 14, 2021, D.D. was in her bedroom with the door locked and she could hear D.D. screaming. Omar stated that D.D. had a habit of screaming for no reason. She testified she did not see Qasim hurt D.D. in any way on April 14. She testified that later that evening D.D. told her she had back pain. D.D. did not want Omar to look at her back but she did and saw red marks on her back. She testified that Qasim also asked to see D.D.'s back but she would not show it to him. Omar also testified that D.D. can be "untruthful."

On cross-examination, Omar explained that she was outside D.D.'s bedroom door when D.D. was screaming in her room. She and D.D. were arguing about something related to D.D.'s soccer coach and D.D. was screaming because she was angry.

Rindone, an initial assessment worker with DHHS, testified that he spoke with S.S. and Azad about what was reported to have occurred on April 14, 2021. S.S told him she did not hear anything that night. She also told him she was scared of her father.

Azad told Rindone that D.D. caused the injuries to herself. He also told Rindone that it is okay to slap a child in the face, as long as it does not leave a mark. Upon further discussion, Azad indicated to Rindone that one of the police officers that had been at the family home on April 14, 2021, told Azad that it was okay to slap a child if it did not leave a mark.

Following the State's closing argument, Qasim made a motion for mistrial based on several comments made by the State. The motion was overruled. Following the closing arguments, the jury was instructed that it could find Qasim guilty of intentional child abuse, guilty of negligent child abuse, or not guilty of child abuse. The jury found him guilty of negligent child abuse, a Class I misdemeanor, and the court accepted the verdict. A sentencing hearing followed, and the court sentenced him to 24 months' probation.

## III. ASSIGNMENTS OF ERROR

Qasim assigns that the district court erred in (1) denying his motion to dismiss and his motion to exclude D.D.'s testimony, (2) denying his motion for mistrial, (3) permitting Rindone to testify to statements he claimed were made by S.S., (4) permitting Rindone to testify to statements he claimed were made by Azad, (5) receiving Jennings' body-worn camera recording of his communication with Qasim, (6) permitting the court's own interpreter to provide a translation of Jennings' body-worn camera recording of his communication with Qasim, (7) receiving the "partially redacted version" of Jennings' body-worn camera recording of his communication with Qasim, (8) receiving into evidence the "Instagram" communication between D.D. and her friend, (9) receiving into evidence the document that D.D. claimed was her "talking to [her friend] about what is happening," (10) permitting D.D. to testify to statements she claimed to have made to third parties regarding the events of April 14, 2021, (11) permitting testimony from witnesses as to statements they claimed were made to them by D.D. regarding the events of April 14, (12) permitting D.D. to testify to a statement she claimed S.S. made to her, (13) requiring Azad to answer the State's question as to whether he told Rindone that it was "okay to discipline a child by slapping them, as long as you did not leave a mark," (14) requiring S.S. to answer the State's questions as to whether she had told Rindone that she was sometimes scared of her father, and whether she had told Rindone that she sometimes locked her door so her father cannot enter because she is scared of him, (15) receiving the "video snippet" from Jennings' body-worn camera recording of his contact with D.D., (16) permitting Henning to testify as to how the marks on D.D.'s back compared to "self-harm" injuries, and (17) permitting D.D. to testify as to her emotional state. Qasim also assigns that the cumulative effect of the district court's erroneous evidentiary rulings prevented Qasim from having a fair trial, and the district court's remarks at sentencing were speculative and demonstrated a bias against Qasim, requiring a new sentencing hearing before a different judge.

## IV. STANDARD OF REVIEW

Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020).

Decisions regarding motions for mistrial are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion. *State v. Madren*, 308 Neb. 443, 954 N.W.2d 881 (2021).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules and judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Figures*, 308 Neb. 801, 957 N.W.2d

161 (2021). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*.

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

## V. ANALYSIS

### 1. ASSIGNMENTS OF ERROR 3-5, 7-12, 15, AND 16

On appeal, an appellant is required to identify in his or her brief the factual and legal bases that support the assignments of error. *State v. Eighteen Thousand Dollars in U.S. Currency*, 311 Neb. 621, 974 N.W.2d 290 (2022); Neb. Ct. R. App. P. § 2-109(D)(1)(i). It is a fundamental rule of appellate practice that an alleged error must be both specifically assigned and argued in the brief of the party asserting the error. *State v. Eighteen Thousand Dollars in U.S. Currency, supra.* The failure to comply with this rule comes with consequences. An argument that does little more than to restate an assignment of error does not support the assignment, and an appellate court will not address it. *Id*.

Qasim has failed to provide an argument in support of his 3rd, 4th, 5th, 7th, 8th, 9th, 10th, 11th, 12th, 15th, and 16th assignments of error. Because Qasim failed to provide a specific argument in support of these assignments of error, we will not address them. See *id.*

### 2. MOTION TO DISMISS AND MOTION TO EXCLUDE TESTIMONY

Qasim assigns that the district court erred in denying his motion to dismiss and motion to exclude the testimony of D.D. because the State failed to comply with its obligation to timely disclose exculpatory evidence. The State contends that any discovery violation was cured by the court granting a continuance.

On June 30, 2022, Qasim filed a motion to continue the jury trial date set for July 5, 2022. He alleged that the State had asked him that day if he had seen exculpatory statements made by D.D. to a therapist recanting the allegations against him. Qasim stated in the motion that this evidence had not been disclosed to him prior to this time. He asked for a continuance so that he could depose the therapist and depose D.D. again. The State did not object. The district court granted a continuance and continued the trial to the September 2022 jury term.

On July 7, 2022, Qasim filed a motion to dismiss and a motion to exclude D.D.'s testimony, arguing that the State failed to timely disclose D.D.'s exculpatory statements. He alleged that the State had known about the statements since August 12, 2021, and did not disclose them to him until June 30, 2022.

Following a hearing, the district court denied both motions, finding that a dismissal was not warranted because Qasim's due process rights had not been violated and the court's continuance order had remedied any violation of Nebraska discovery rules.

Qasim first argues that the timing of the State's disclosure of exculpatory statements violated his constitutional rights to due process, based on *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Under *Brady*, the nondisclosure by the prosecution of material evidence favorable to the defendant, requested by the defendant, violates due process, irrespective

of the good faith or bad faith of the prosecution. But due process is not violated where the evidence is disclosed during trial. *State v. Turner*, 315 Neb. 661, 998 N.W.2d 783 (2024).

In the present case, the State disclosed the evidence at issue before trial and Qasim was granted a continuance. Accordingly, the constitutional requirements of *Brady* were not violated.

Qasim also argues that the timing of the State's disclosure violated Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2022), Nebraska's principal discovery statute in criminal cases, which sets forth a list of evidence that may be subject to discovery at the discretion of the trial court. *State v. Turner, supra.* Under § 29-1912, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal. *State v. Harris*, 296 Neb. 317, 893 N.W.2d 440 (2017).

Neb. Rev. Stat. § 29-1919 (Cum. Supp. 2022) sets forth various remedies the court may employ when there is a claimed violation of a discovery order: The court may (1) order such party to permit the discovery or inspection of materials not previously disclosed, (2) grant a continuance, (3) prohibit the party from calling a witness not disclosed or introducing in evidence the material not disclosed, or (4) enter such other order as it deems just under the circumstances. *State v. Turner, supra*. While a court may order that a party not be permitted to offer evidence at trial which it failed to disclose, this court has stated a preference for a continuance in such situations. *Id.*

When a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction that will adequately punish the government and secure future compliance. *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021)*.* The Nebraska Supreme Court has described its preference for a continuance in such situations where the continuance could cure any prejudice caused by the government's noncompliance. *Id.* The continuance is seen as the vehicle that commonly will eliminate the prejudice of surprise by placing the defense in a position similar to that in which it would have stood if timely disclosure had been made. *Id.*

We conclude there was no violation under § 29-1912 that would warrant dismissal or make it necessary to exclude D.D.'s testimony. Qasim discovered the exculpatory evidence on June 30, 2022, and although this was only several days before the scheduled trial date, the court granted Qasim a continuance and the new trial date was set for September 2022. He was allowed to re-depose D.D. and take depositions of additional witnesses related to the exculpatory evidence. Therefore, he was able to investigate and prepare his defense with all the relevant information. The court's continuance and allowance of depositions was enough to cure any discovery violation that may have occurred. We conclude that the district court did not abuse its discretion in denying Qasim's motion to dismiss and motion to exclude D.D.'s testimony. This assignment of error fails.

### 3. Motion for Mistrial

Qasim assigns that the district court erred in denying his motion for mistrial. He claims that he was entitled to a mistrial based on statements made by the State during its closing argument that amounted to prosecutorial misconduct.

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Esch*, 315 Neb. 482, 997 N.W.2d

569 (2023). Decisions regarding motions for mistrial are directed to the discretion of the trial court. *Id.* When attempting to prove error predicated on the failure to grant a mistrial, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.*

Prosecutors are charged with the duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial. *State v. Nolan*, 292 Neb. 118, 870 N.W.2d 806 (2015). Because prosecutors are held to a high standard for a wide range of duties, the term "prosecutorial misconduct" cannot be neatly defined. *Id.* Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Id.*

Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *Id.* It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id.*

Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *Id.* In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *Id.*

Qasim argues that a mistrial was warranted based on four separate statements made by the State during closing argument as set forth below.

(a) Characterization of Evidence

Qasim first argues that the State falsely mischaracterized the evidence when it stated that D.D. testified that Qasim touched her breast. D.D. testified that at some point after the altercation on April 14, 2021, Qasim apologized to her and gave her phone back to her. She stated that Qasim kissed her neck and tried to touch her chest, but she pushed him away. During closing argument, the State argued that D.D. got her phone back from Qasim "after certainly a strange and troubling exchange, where she testified that he tried to kiss her or kiss her on the neck, and tried to touch her breast." Qasim argues that the State was trying to "inflame the passions of the jury against Qasim by fabricating a sexual component to the evidence." Brief for appellant at 30.

A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence. *State v. Tyler*, 301 Neb. 365, 918 N.W.2d 306 (2018). However, a prosecutor is entitled to draw inferences from the evidence in presenting his or her case, and such inferences generally do not amount to prosecutorial misconduct. *Id.* We conclude that the State's remark that Qasim tried to touch her breast, rather than chest, was not improper, as it was a reasonable inference from the evidence.

## (b) Nonexistent Evidence

Qasim next argues that the State committed misconduct by arguing the existence of evidence that did not exist when it stated that Omar refused to answer whether she had been told what might happen to Qasim if he were to "lose." Brief for appellant at 30. Qasim contends that Omar did not refuse to answer but rather, testified "no" in response to the State's question. However, his citation to the record in his appellate brief regarding Omar's answer is from S.S.'s testimony, not Omar's testimony.

The record shows that the State asked Omar twice if anyone had told her what would happen to Qasim if he were convicted of the alleged offense. Both times her response was that her husband was innocent and did not do anything wrong. The State moved to strike her answer both times as nonresponsive, which the court sustained, and the jury was told to disregard the answer. After the jury was told to disregard the answer the second time, Omar said "no," but no question was before her at that time.

Qasim further contends that what the State was really insinuating to the jury by stating that Omar would not answer the question was that she was not credible. He contends that this conduct is prohibited by Neb. Ct. R. of Prof. Cond. § 3-503.4(e), which states in part that a lawyer shall not state a personal opinion as to the credibility of a witness. However, when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to highlight the relative believability of witnesses for the State and the defense. See *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016). Even if the State was trying to insinuate that Omar was not credible, it did not state a personal opinion of Omar's credibility and it was drawing inferences from the evidence.

## (c) Credibility of Defense Witness

Qasim next argues that the State fabricated expert testimony during its closing when it stated that "the force to cause [D.D.'s] injuries themselves would have made noise, too." He argues that the State was implying that "D.D. could not have injured herself as a matter of physics, because had she done so, the 'force' used would have made 'noise,' but there was no evidence adduced as to an amount of 'force,' let alone an amount that would have 'made noise.'" Brief for appellant at 30-31.

The statement Qasim challenges was made while the State was talking about how D.D.'s family members denied that Qasim had caused D.D.'s injuries and believed that she caused them herself. The State further noted that the family members never heard any screams of pain or heard sounds of her being hit with the charging cord, which the State implied someone would have heard, had D.D. harmed herself. The State was not "fabricating expert testimony," it was simply arguing reasonable inferences from the evidence, which did not amount to misconduct. See *State v. Tyler, supra* (prosecutor entitled to draw inferences from evidence in presenting his or her case, and such inferences generally do not amount to prosecutorial misconduct).

## (d) Strength of Defense

Qasim next argues that the State improperly argued that his defense was unjust when it stated that "many of the defenses that [Qasim has] put forward are unreasonable in light of all the evidence that [we have] had." He contends that the prosecutor's statement that Qasim put on an

"unreasonable" defense was "an improper opinion as to the justness of a cause," was prohibited by § 3-503.4(e). Brief for appellant at 31.

Section 3-503.4(e) of the Nebraska Rules of Professional Conduct provides in part, that a lawyer shall not "state a personal opinion as to the justness of a cause." However, when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. *State v. Gonzales, supra*. Thus, in cases where the prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence. *Id.*

The State's comment was not an expression of a personal belief, but a permissible comment on the strength of the evidence presented by Qasim.

After considering the four statements made by the State during closing arguments that Qasim argued amounted to prosecutorial misconduct, we determine there was no prosecutorial misconduct. This assignment of error fails.

### 4. USE OF COURT INTERPRETER

Qasim assigns that the district court erred in allowing the court's interpreter to translate Qasim's responses recorded on Jenning's body-worn camera into English for the jury. After Jennings' body-worn camera recording of his communication with Qasim on April 14, 2021, was received into evidence, the State requested permission to publish it by playing it for the jury and having the court's interpreter translate Qasim's responses. Qasim objected to the court's interpreter being used for this purpose, and the court overruled the objection. Qasim argues that the interpreter was not competent to be a witness and was not sworn for this purpose. He also contends the use of the court's interpreter was improper because this was the same interpreter that was interpreting English-language testimony for Qasim during trial.

We first note that there were two court interpreters that provided interpretation during the trial. Both interpreters were sworn in by the court at the start of the trial, swearing that they would provide interpretation to the best of their ability. Qasim had no objection to the use of the court's interpreters at that time. Qasim fails to provide any legal authority as to why the use of the court's interpreter to translate the video recording was inappropriate or prejudicial. Accordingly, this assignment of error fails.

### 5. QUESTION ASKED OF AZAD ON CROSS-EXAMINATION

Qasim assigns that the district court erred in requiring Azad to answer the question on cross-examination as to whether he told Rindone that it was "okay to discipline a child by slapping them, as long as you did not leave a mark." Qasim contends the question was beyond the scope of direct examination, irrelevant, and called for hearsay, which were the objections he made at trial. He does not argue why his objections should have been sustained. Rather, he only argues that allowing Azad to answer the question led to the State asking further questions of other witnesses related to the statement on rebuttal. He claims that "[h]ad the district court properly sustained

Qasim's objection to the prosecutor's question of Azad, there would have been no rebuttal case." Brief for appellant at 37.

On cross-examination, Azad testified that as the oldest child, he helped his parents discipline his siblings, and his parents had modeled for him how to discipline children. He further testified that disciplining his siblings meant advising them, not hurting or harming them. Azad also testified that he had contact with Rindone following the events of April 14, 2021. The State asked him if it was true that when he spoke with Rindone he stated his belief that it was okay to slap a child in the face as long as you do not leave a mark. Qasim objected and counsel for the parties had a discussion outside the presence of the jury. The State argued that it was asking the question to impeach his credibility. Qasim's objections were overruled. Azad then answered the question by stating that he did not remember making that statement and he was sure he would not say that. After Azad answered the question, the State did not ask any further questions on the matter.

Based on our review of the record, we conclude that the district court did not err in overruling Qasim's objection to the question posed to Azad about slapping a child. The testimony was relevant because D.D. testified that during the incident at issue, Qasim slapped her on her face. She also testified that Azad physically grabbed her by the shoulder and her hair and threw her into the living room, which Azad denied. Azad testified that the form of discipline modeled by his parents was advising children rather than hurting or harming them. Accordingly, evidence that Azad believed it was okay to slap a child impeached his testimony and credibility and was therefore relevant. Further, because the State's question went to Azad's credibility, the question was proper for cross-examination. See Neb. Rev. Stat. § 27-611(2) (Reissue 2016) (cross-examination should be limited to subject matter of direct examination and matters affecting credibility of witness). And because the State was seeking to impeach Azad with a prior inconsistent statement, the statement was not hearsay. *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015) (out-of-court statements offered to prove truth of matter asserted are hearsay; thus, prior extrajudicial statements of witness may be received into evidence for purpose of assisting jury in ascertaining credibility of witness, but unless they are otherwise admissible, they may not be considered as substantive evidence of facts declared in statements). This assignment of error fails.

### 6. QUESTIONS ASKED OF S.S. ON CROSS-EXAMINATION

Qasim assigns that the district court erred in requiring S.S. to answer the State's questions about being scared of her father. The State asked her if she was sometimes scared of her father, and she indicated she was not. The State then asked her if she told Rindone that she was sometimes scared of her father, and she denied making the statement. She also denied telling Rindone that she locked her bedroom door at night so Qasim could not come in because she is scared of him. Qasim argues the questions were beyond the scope of direct examination and irrelevant. Rather than arguing why his objections should have been sustained, he argues that allowing S.S to answer these questions led to the State asking further questions regarding the statements on rebuttal. He again claims that "[h]ad the district court properly sustained Qasim's objection to the prosecutor's questions of S.S., there would have been no rebuttal case." Brief for appellant at 37-38.

S.S. testified on direct examination that she did not see Qasim assault D.D. and that he was a peaceful man. On cross-examination the State asked her the questions about being scared of her father and she denied making such statements.

The State's questions to S.S. were relevant. The possibility that S.S. feared Qasim impeached her testimony that Qasim had not assaulted D.D. and that he was a peaceful person. Furthermore, the State's questions went to S.S.' credibility, and thus was proper for cross-examination. See § 27-611(2) (cross-examination should be limited to subject matter of direct examination and matters affecting credibility of witness). This assignment of error fails.

## 7. D.D.'s Testimony of Emotional State

Qasim assigns that the district court erred in permitting D.D. to testify as to her emotional state because the testimony was irrelevant. He argues the State was trying to curry sympathy from the jury and bolster her credibility by making it seem that she must be telling the truth because of the emotional strain the case had on her.

D.D. testified that she still loved her parents, and it was difficult going through the case because even though she was doing the right thing by telling the truth, she did not want to hurt her parents. She stated that testifying against her father was hurting her because she knew it was hurting her parents. She also testified that she was nervous and sad about testifying because she did not know what was going to happen to her parents because of the trial. D.D.'s feelings toward her father and her mixed emotions about testifying against her father were relevant because Qasim had presented evidence suggesting that D.D. had made false accusations against him. D.D.'s testimony regarding her "emotional state" related to her willingness to fabricate a lie against her father. This assignment of error fails.

## 8. Cumulative Effect of Evidentiary Rulings

Qasim assigns that the cumulative effect of the district court's erroneous evidentiary rulings prevented him from having a fair trial. He contends that even if any one of the evidentiary rulings in and of itself was not prejudicial, the cumulative effect of the errors deprived him of a fair trial.

Although one or more trial errors in a criminal jury trial might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his constitutional right to a public trial by an impartial jury. See *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo. We conclude after our review of the record that Qasim's argument that cumulative error deprived him of his right to a fair trial is without merit.

## 9. Trial Judge's Impartiality at Sentencing

Qasim assigns that the district court's remarks at sentencing that it believed Qasim suborned perjury, and that the jury believed it as well, were not based on the evidence or the jury's verdict, or a reasonable inference to be drawn from either, and exhibited a bias against Qasim, and entitled him to be resentenced.

The right to an impartial judge is guaranteed under the Due Process Clauses of the U.S. and Nebraska Constitutions, the parameters of which are coextensive. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). It is a judge's duty to disqualify himself or herself whenever the judge's impartiality might reasonably be questioned. *Id.* "Impartial" means, in part, the "absence of bias

or prejudice in favor of, or against, particular parties or classes of parties." *Id*. at 837, 993 N.W.2d at 459. When evaluating a trial judge's alleged bias, the question is whether a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *Id.*

As Qasim sets forth, the court made a comment at sentencing that Qasim "had his witnesses lie under oath at trial, and also that the jury obviously felt the same way." Qasim argues there is no evidence that he encouraged witnesses to lie at trial and it is not a reasonable inference to be drawn from the evidence or the jury's verdict. He contends the trial judge's remarks were speculative and demonstrated a personal bias against him at sentencing.

The statement by the court quoted above was immediately followed with, "But [Qasim] does not have any criminal record, and I believe he is a provider for his family and an appropriate candidate for probation." This indicates the court was not biased against Qasim. Further, there was evidence at trial that Qasim told D.D. to lie about what happened to her, indicating she should say she caused the injuries to herself. Based on the record before us, there is no reason to question the trial judge's impartiality or bias in sentencing Qasim. This assignment of error fails.

## VI. CONCLUSION

For the foregoing reasons, we affirm Qasim's conviction and sentence.

AFFIRMED.